05-1664-cv
Vives v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2005

(Argued:  December 16, 2005                              Decided: May 1, 2008)

Docket No. 05-1664-cv

_____

CARLOS VIVES,

                                                              Plaintiff-Appellee,

-v-

THE CITY OF NEW YORK and RAYMOND KELLY, Commissioner of the New York City
Police Department,[*]

                                                              Defendants-Appellants.

_____

Before:  POOLER, KATZMANN, and PARKER, Circuit Judges.

_____

        Defendants City of New York ("City") and Commissioner Raymond Kelly appeal a

judgment awarding plaintiff Carlos Vives $3,300 in damages for the City's violation of his

Fourth and Fourteenth Amendment rights.  The sole issue presented by the appeal is whether the

City's acknowledged policy of enforcing New York Penal Law § 240.30(1) is a policy within the

_____

        [*] The Clerk of the Court is directed to conform the official caption to this caption.

meaning of <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658

(1978), that caused the violation of Vives's rights.  We find the record insufficient to resolve this

issue and therefore vacate and remand.

 VACATED and REMANDED.

_____

ELIZABETH I. FREEDMAN, Assistant Corporation Counsel (Michael A. Cardozo, Corporation
 Counsel of the City of New York, Francis F. Caputo and Caryn Rosencrantz, Assistant
 Corporation Counsels, on the brief), New York, NY, <u>for Defendants-Appellants</u>.

CHRISTOPHER DUNN (Arthur Eisenberg and Corey Stoughton on the brief), New York Civil
 Liberties Union Foundation, New York, NY, <u>for Plaintiff-Appellee</u>.

_____

POOLER, <u>Circuit Judge</u>:

## INTRODUCTION

Carlos Vives sent a New York City ("City") politician written materials that were likely

to cause her alarm and that did alarm her.  As a result, he was arrested for violating New York

Penal Law § 240.30(1), which criminalizes such actions, and detained for several hours.  In a

decision that has not been appealed, the United Stated District Court for the Southern District of

New York (Scheindlin, <u>J.</u>) held that Section 240.30(1) is unconstitutionally overbroad on its face.

In the determination now under review, the district court held that the City promulgated a policy

within the meaning of <u>Monell v. Department of Social Services of the City of New York</u>, 436

U.S. 658 (1978), by choosing to enforce Section 240.30(1).  Damages were then tried to a jury,

which awarded Vives $3,300.  On appeal, the City argues that its enforcement of Section

240.30(1) cannot be construed as a <u>Monell</u> policy.  We find that the record before the district

2

court did not justify a grant of summary judgment and therefore vacate and remand for further proceedings that could include additional discovery, briefing by New York's Solicitor General, and a new decision by the district court.

**BACKGROUND**

Vives, a resident of the City, sometimes sends press clippings and written statements to "people of the Jewish faith with the intent to alarm them about current world events that have been prophesied in the Bible, including the unification of the European countries into a single political and military entity." Vives v. City of New York, 305 F. Supp. 2d 289, 294 (S.D.N.Y. 2003) ("Vives I") (quoting August 21, 2003, affidavit of Carlos Vives ¶ 4), rev'd in part, 405 F.3d 115 (2d Cir. 2004) ("Vives II"). He sent one such packet to Jane Hoffman, who was then a candidate for Lieutenant Governor. Although City police officers found no threatening statements in the packet, they were instructed by their supervising lieutenant to arrest Vives for aggravated harassment in violation of Section 240.30, which provides that "[a] person is guilty of aggravated harassment in the second degree when, with intent to harass, annoy, threaten or alarm another person, he or she . . . [1] communicates with a person, anonymously or otherwise, by . . . mail . . ., in a manner likely to cause annoyance or alarm."

As a result of this arrest, Vives was held in a cell for several hours. Ultimately, the district attorney declined to prosecute.

Vives sued the City, the two detectives who arrested him, and Raymond Kelly, the police commissioner, alleging, inter alia, that his arrest and subsequent detention violated his First and Fourth Amendment rights. He sought damages, a declaration that Section 240.30(1) is unconstitutional insofar as it prohibits merely "annoying or alarming" speech, and injunctive

3

relief.

The parties cross-moved for summary judgment. The district court held that (1) because Section 240.30(1) violated the First Amendment, the officers lacked probable cause to arrest Vives and violated the Fourth Amendment, Vives I at 301-02; (2) the officers did not establish that they were entitled to qualified immunity as a matter of law, id. at 303; and (3) injunctive relief would issue against Kelly prohibiting him from enforcing the objectionable portion of the statute against Vives but not against others, id. at 304.

Defendants brought an interlocutory appeal challenging the qualified immunity determination. Without deciding whether the statute was constitutional, we reversed, holding "that defendants did not have fair notice of section 240.30(1)'s purported unconstitutionality." Vives II, 405 F.3d at 118. In a separate partial concurrence and partial dissent, Judge Cardamone argued that the court should have reached the issue of Section 240.30(1)'s constitutionality and found it to be unconstitutional. See id. at 119-24 (Cardamone, J., concurring in part and dissenting in part).

Even before our decision in Vives II, the City moved for judgment pursuant to Federal Rule of Civil Procedure 12(c), contending that Vives could not establish that any City policy caused him harm because Section 240.30(1) was enacted by the state legislature. The district court denied the City's motion in an oral decision. The district court held that there was a dispositive difference between state statutes that a municipality is required to enforce and state statutes that a municipality is merely authorized to enforce. The district court concluded that a municipality cannot be liable for enforcing a mandatory state statute but it can be liable for enforcing statutes that merely authorize enforcement by municipalities. Having denied the Rule

4

12(c) motion, the court allowed the parties to pursue discovery to determine whether New York required or commanded the city to enforce state penal laws.

After discovery, the parties cross-moved for summary judgment on municipal liability. The district court granted summary judgment to plaintiffs because it was undisputed that the City had a practice and policy of enforcing Section 240.30(1) and the City offered no evidence that it was mandated to enforce the statute. Vives v. City of New York, No. 02-Civ-6646, 2004 WL 2997947, at *2-3 (S.D.N.Y. Dec. 27, 2004).

Following a jury trial on damages, the City appealed, contending solely that the district court erred when it held that the City's policy of enforcing Section 240.30(1) is a municipal policy within the meaning of Monell.

**DISCUSSION**

Where a plaintiff claims a constitutional violation as a consequence of the decision of a municipality to enforce an unconstitutional state statute, blame could theoretically be allocated three ways: first, to the state that enacted the unconstitutional statute; second, to the municipality that chose to enforce it; and third, to the individual employees who directly violated plaintiff's rights. As a practical matter, however, damages are not available against the state because it is not a person within the meaning of Section 1983. Will v. Mich. Dep't of State Police, 491 U.S. 58, 64 (1989). Moreover, like the individual defendants in this case, individual employees will often be able to successfully assert qualified immunity. Thus, the plaintiff will often be left to assert his damages claim only against the municipality.

Unlike a state, a municipality is a person within the meaning of Section 1983, see Monell, 436 U.S. at 690, and, unlike individual defendants, a municipality may not assert qualified

5

immunity based on its good faith belief that its actions or policies are constitutional, see Owen v. City of Independence, 445 U.S. 622, 650 (1980). The Owen Court explained its decision not to extend qualified immunity to municipalities as follows:

> We believe that today's decision, together with prior precedents in this area, properly allocates [the costs of official misconduct] among the three principals in the scenario of the § 1983 cause of action: the victim of the constitutional deprivation; the officer whose conduct caused the injury; and the public, as represented by the municipal entity. The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury. The offending official, so long as he conducts himself in good faith, may go about his business secure in the knowledge that a qualified immunity will protect him for personal liability for damages that are more appropriately chargeable to the populace as a whole. And the public will be forced to bear only the costs of injury inflicted by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."

Owen, 445 U.S. at 657 (quoting Monell, 436 U.S. at 694). Thus, a municipality is liable for even its good faith constitutional violations presuming that the municipality has a policy that causes those violations. See id.

"[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985). Policy, in the Monell sense, may of course be made by the municipality's legislative body, see Owen, 445 U.S. at 628-29, but it also may be made by a municipal official "possess[ing] final authority to establish municipal policy with respect to the action ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986). In identifying the official having authority with respect to a particular issue, federal courts must analyze state law. McMillian v. Monroe County, 520 U.S. 781, 786 (1997).

The crux of the City's argument is that although it has a "policy in fact" of enforcing the

6

Penal Law, it is the State's enactment of Section 240.30(1) that caused Vives's constitutional violation. The City contends that "[a] municipality does not implement or execute a policy officially adopted and promulgated by its officers when it merely enforces the Penal Law of the State that created it." Appellants' Br. at 22; cf. City of New York v. State, 631 N.Y.S.2d 553, 555 (1995) (holding that New York City, as a "creature[] or agent[]" of the state may not sue it); Trenton v. New Jersey, 262 U.S. 182, 185-87, 191 (1923) (holding that a municipality acts as an agent of the state in exercising the powers delegated to it by the state).

The issue of whether—and under what circumstances—a municipality can be liable for enforcing a state law is one of first impression in this circuit. It is also one of great significance both to injured citizens, who may be able to recover against a municipality when other avenues of recovery are cut off if we rule in favor of Vives, and to municipalities, which may incur significant and unanticipated liability in the same event. Like the district court, we look to the decisions of other circuits for guidance, but we bear in mind that these decisions are useful only insofar as they illuminate the foundational question of whether a municipal policymaker has made a meaningful and conscious choice that caused a constitutional injury.

Three circuits—the Sixth, Ninth, and Eleventh—have issued decisions that, to varying degrees, support plaintiff's contention that a municipality engages in policy making when it determines to enforce a state law that authorizes it to perform certain actions but does not mandate that it do so. See Garner v. Memphis Police Dep't, 8 F.3d 358, 364 (6th Cir. 1993) (holding that municipality's policy of allowing deadly force in certain situations was a Monell policy even though a state statute authorized the use of deadly force in the situations allowed by the municipality as well as others, because the state law did not require the use of deadly force in

7

any situation);[1] Evers v. County of Custer, 745 F.2d 1196, 1201 (9th Cir. 1984) (holding that County Board's issuance of a declaration that plaintiff's road was public suffced to impose liability although state law allowed such a declaration); Cooper v. Dillon, 403 F.3d 1208, 1222-23 (11th Cir. 2005) (holding that municipality could be liable for enforcing an unconstitutional state statute when (1) a municipal ordinance prohibited all crimes proscribed by state law, and (2) the state law merely authorized enforcement without requiring it).

While these decisions can be read to suggest that a distinction should be made between a state law mandating municipal action and one that merely authorizes it, in each case the policymaker was alleged to have gone beyond merely enforcing the state statute. In Evers, the County Board issued a declaration subjecting a particular piece of property to a finding authorized by state law. See Evers, 745 F.2d at 1198. In Garner, the municipality promulgated a deadly force policy that differed from the policy authorized by state law albeit in ways that restricted the use of deadly force. See Garner, 8 F.3d at 361. Finally, in Cooper, the municipality enacted an ordinance reflecting its intent to enforce state criminal law and the officer who decided to enforce this ordinance against the plaintiff was a policymaker. See Cooper, 403 F.3d at 1221-23.

The City's position is supported—again to varying degrees—by Fourth, Seventh, and Tenth Circuit authority. See Bockes v. Fields, 999 F.2d 788, 791 (4th Cir. 1993) (holding that

---

[1] The City relies on a different Sixth Circuit case, Pusey v. City of Youngston, 11 F.3d 652 (6th Cir. 1993), in which the court held that a municipal prosecutor acted on behalf of the state when she prosecuted a state crime. Id. at 657. In this case, the two individual police officers may have been acting on behalf of the state when they arrested Vives. However, Vives does not argue that the City should be vicariously liable for the officers' actions. Rather, he claims that the City itself formulated an unconstitutional policy that allowed his arrest.

8

county board did not act in a policy-making capacity when it fired plaintiff because termination procedures and criteria were prescribed by the state although the state procedures allowed the county board some discretion); Surplus Store and Exch., Inc. v. City of Delphi, 928 F.2d 788, 791 (7th Cir. 1991) (holding insufficient for Monell liability plaintiff's claim that municipality had a policy of enforcing state statutes and stating: "It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law.");[2] Whitesel v. Sengenberger, 222 F.3d 861, 872 (10th Cir. 2000) (stating that it was not clear whether policies of state entity authorized certain actions but "emphasiz[ing] that the [municipal entity] cannot be liable for merely implementing a policy created by the state [entity]").

As with the cases supporting plaintiff's position, none of these decisions is squarely on point. Although Surplus Store contains broad language, it involves not the enforcement of a state statute but rather the use of state statutes by an individual employee to carry out an allegedly unconstitutional action. See Surplus Store, 928 F.2d at 789. Moreover, there was no allegation that any policymaker had ever considered whether the particular state statutes at issue should be used by city employees. Bockes' holding—that a county board does not act as a policymaker when it fires an employee pursuant to state procedures—is tangential to the issue before us. Finally, the Whitesel court remanded so that the parties could offer evidence as to whether the county board had formulated a constitutionally offensive policy, finding that the record was not

---

[2] A later panel of the Seventh Circuit read Surplus Store as incorporating the mandate/authorize distinction and thus as consistent with Garner. See Bethesda Lutheran Homes and Servs., Inc. v. Leean, 154 F.3d 716, 718 (7th Cir. 1998). That portion of Bethesda Lutheran is dicta, however, because the court found the policy in issue to be mandatory and thus further held that the city was not liable. Id. at 718-19.

9

sufficiently developed to grant summary judgment to either party. 222 F.3d at 871-72.

Therefore, it did not determine whether any particular action on the part of the municipality would constitute formulation of a policy.[3]

There being no decided tilt toward either party's position in the decisions of our sister circuits, we turn to an analysis of the extent to which those decisions rest on considerations pertinent to identifying a Monell policy. Of the requirements that we previously discussed, the two put into issue by the City are that (1) a policy will ordinarily be the result of a conscious choice and (2) the policy must actually cause the constitutional violation. See Tuttle, 471 U.S. at 823. Unfortunately, Evers, Bockes, and Whitesel do not articulate an explanation tied to the "conscious choice" and causation requirements for imposing liability on municipalities. However, Surplus Store, Garner, and Cooper do. Surplus Store focuses in part on the causation requirement, holding that the connection between a municipality's decision to uphold state law and the subsequent constitutional violation is simply too "attenuated." 928 F.2d at 791. Garner also addresses causation but holds that because the municipality was free never to use deadly force, its decision to do so under restricted circumstances caused the death of plaintiff's

---

[3] The City also claims that its position is supported by decisions from the First, Third, and Fifth Circuits. In each instance, the claimed support is illusory, resting on either misapprehension or inaccurate citation of the relevant case. The City's citation from the First Circuit is to the opinion of a single concurring judge. See Yeo v. Town of Lexington, 131 F.3d 241, 257 (1st Cir. 1997) (Stahl, J., concurring). The in-banc majority did not discuss Monell liability because it decided that plaintiff failed to show state action. See id. at 248 n.3. The Third Circuit did not decide the issue of municipal liability but rather simply discussed an argument made by the parties, quoting both Surplus Store and Garner in doing so. See Doby v. DeCrescenzo, 171 F.3d 858, 868-69 (3d Cir. 1999). Finally, the Fifth Circuit's decision, Echols v. Parker, 909 F.2d 795, 801 (5th Cir. 1990), holds only that a county official is acting as a state agent when he or she enforces a state policy, a proposition that is not relevant to the issue before us.

decedent. 8 F.3d at 365. For the same reason, the Garner court held that the municipality had exercised a conscious choice when it decided to use deadly force in the situations set forth in its policy. Id. at 364. In Cooper, the Eleventh Circuit focused on the defendant chief of police's conscious decision to enforce a state statute against plaintiff. 403 F.3d at 1223. As we have noted previously, Surplus Store is something of an outlier because it involved the use of a state statute rather than the enforcement of the statute. And Garner and Cooper do not suggest that every time a municipality decides that, as a general matter, it will enforce the state penal law, the municipality is liable.

Freedom to act is inherent in the concept of "choice." Therefore, in addressing the conscious choice requirement, we agree with all circuits to address state laws mandating enforcement by municipal police officers that a municipality's decision to honor this obligation is not a conscious choice. As a result, the municipality cannot be liable under Monell in this circumstance.[4] On the other hand, if a municipality decides to enforce a statute that it is authorized, but not required, to enforce, it may have created a municipal policy. However, we do not believe that a mere municipal directive to enforce all state and municipal laws constitutes a city policy to enforce a particular unconstitutional statute. In our view, the "conscious" portion of the "conscious choice" requirement may be lacking in these circumstances. While it is not required that a municipality know that the statute it decides to enforce as a matter of municipal policy is an unconstitutional statute, see Owen, 445 U.S. at 650, it is necessary, at a minimum,

---

[4] While we hold here that a municipality's "decision" to fulfill a mandatory obligation does not constitute a "choice," we do not express an opinion on whether incentives or penalties imposed by the state or federal government on a municipality as a consequence of a "decision" can be so coercive as to transform a "choice" into an "obligation."

11

that a municipal policymaker have focused on the particular statute in question. We, therefore, hold that there must have been conscious decision making by the City's policymakers before the City can be held to have made a conscious choice.[5] Evidence of a conscious choice may, of course, be direct or circumstantial.

These conclusions lead us to two subsidiary questions, neither of which can be resolved on the record before us: (1) whether the City had a meaningful choice as to whether it would enforce Section 240.30(1); and (2) if so, whether the City adopted a discrete policy to enforce Section 240.30(1) that represented a conscious choice by a municipal policymaker.

## I. Meaningful Choice

The first question is more difficult than it might seem in light of the City's apparent concession that the City has the discretion to determine "how best to allocate limited police resources and priorities" in deciding when and whether it will enforce a particular section of the Penal Law. Letter of Elizabeth I. Freedman dated 7/13/07, at 2. To be sure, discretion to enforce or not enforce a statute in an individual situation is different from discretion to choose not to enforce a statute—or, as in this case, portions of a statute—at all. But we simply cannot decipher whether the City purports to have this latter discretionary power. Among the questions on remand is whether the City had the power to instruct its officers not to enforce a portion of Section 240.30(1) because it was unconstitutional or a waste of resources, or for some other reason.

Certainly the parties have not identified a provision of state law or regulation that requires

---

[5] In this case, the plaintiff does not argue that liability exists based on a City custom, see Bd. of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997). Therefore, we have no occasion to consider the role of conscious decision making in a "custom" case.

a municipality to enforce the state penal law. Further, Section 240.30(1) itself does not constitute such a mandate because it simply defines an offense without directing municipal officials to take any steps to act when the statute is violated.[6] However, we are uncertain whether the City's very status as a "creature[] or agent[] of the state," City of New York, 631 N.Y.S.2d at 555, obligates it to enforce state laws. (We recognize that New York has somewhat altered the balance of power between the state and the city by amending the constitution to allocate certain home rule powers to local governments. See N.Y. Const. art. 9; see also N.Y. Mun. Home Rule Law § 10.)

Nor do New York cases addressing individual officers' discretion not to enforce state laws resolve this question. An individual who asks a court to direct a local official to enforce a law will likely fail based on the discretion accorded to municipalities and/or individual officers in determining when to enforce state law. See Perazzo v. Lindsay, 290 N.Y.S.2d 971, 972-73 (1st Dep't), aff'd on opn. below, 296 N.Y.S.2d 957 (1968). "It is the settled policy of the courts not to review the exercise of discretion by public officials in the enforcement of State statutes, in the absence of a clear violation of some constitutional mandate." Gaynor v. Rockefeller, 256 N.Y.S.2d 584, 592 (1965); cf. Town of Castle Rock, Colo., v. Gonzales, 545 U.S. 748, 761 (2005) (declining to find a property right in the enforcement of a restraining order in part because of "[t]he deep-rooted nature of law-enforcement discretion, even in the presence of seemingly

---

[6] In this respect, Section 240.30 differs significantly from New York State Agricultural and Markets Law § 371, which the New York Appellate Division, Third Department, held created a duty of enforcement for law enforcement officers. See In re Jurnove, 832 N.Y.S.2d 655, 656-57 (2d Dep't 2007). Section 371 provides: "A constable or police officer must . . . issue an appearance ticket . . ., summon or arrest, and bring before a court or magistrate having jurisdiction, any person offending against any of the provisions of article twenty-six of the agriculture and markets law." (emphasis added).

13

mandatory legislative commands"). These cases concern the first sort of discretion that we posited — case-by-case discretionary authority and therefore are not relevant.

We found no precedent addressing the issue we believe to be controlling: whether the Police Department's policy makers can instruct its officers not to enforce a given section—or portion thereof— of the penal law. One case does address the authority of a state court to enforce its own orders by directing a writ of mandamus to a police department. See In re Boung Jae Jang v. Brown, 560 N.Y.S.2d 307, 310 (2d Dep't 1990) ( holding that the New York State Supreme Court has the requisite authority based on "[the court's] inherent authority to interpret the Constitution, which the Police Department is sworn to uphold, [and] New York City Charter § 435(a)." However, a state court's authority to require a police department to enforce the court's order is only tangentially related to the state's authority to require a police department to enforce the state's penal statutes. Further, even if the state may require municipalities to enforce state penal laws, there is no evidence currently before us that it has done so. Thus, Boung Jae Jang, like the cases addressing the police department's discretion to enforce or not enforce a particular penal statute depending on particular circumstances, does not resolve the issue before us.

In an effort to resolve our uncertainty concerning the existence of a state mandate to enforce state penal law, we directed the parties to consider whether New York City Charter § 435(a) constitutes such a mandate. It provides:

> The police department and force shall have the power and it shall be their duty to . . . enforce and prevent the violation of all laws and ordinances in force in the city; and for these purposes to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses.

This provision was approved by the voters of New York City in 1936 as part of their approval of a charter proposed by the New York City Charter Revision Commission. See Laurence Arnold Tanzer, The New York City Charter 1-2 (1937).[7] The authority to propose the charter was delegated to the New York City Charter Revision Commission by the state legislature, L. 1934, ch. 867, after the New York Constitution was amended to allow the state to delegate certain legislative powers to municipalities and to prohibit the state from legislating in these areas of "home rule." See Mooney v. Cohen, 272 N.Y. 33, 37 (1936). Section 435 derives from Section 315 of an earlier charter enacted for New York City by New York State. Tanzer at 353. Section 315 of the Greater New York Charter, Chapter 378, Laws of 1897 provided that the police department had the duty to "enforce and prevent the violation of all laws and ordinances in force in said city." Letter from Elizabeth I. Freedman, Assistant Corporation Counsel, City of New York, to the Court 2 (July 13, 2007).

The City argues that because Section 435(a) derives from state-enacted Section 315, it "is . . . a generalized State policy, not a municipal enactment." Id. However, the City also steadfastly refuses to deny that it lacks case-by-case discretion in determining whether to enforce any particular penal statute and suggests that it can make policy decisions about which statutes to enforce in the course of allocating its resources. Focusing on the charter provision as it exists today and not on its history, Vives contends that it cannot be viewed as a mandate from the state because it was adopted by the voters of the City.

In light of the unclear case law and the parties' differing positions on Section 435(a), the central question of whether the City is mandated by New York State to enforce all penal laws

---

[7] In the 1936 Charter, Section 435(a) was simply Section 435.

15

remains unresolved. We would benefit—and we believe the district court would as well—from the New York Solicitor General's view of the obligation of the New York Police Department to enforce the Penal Law. Further, the state has an interest in this question that is not adequately represented by either of the parties. Vives, of course, seeks to maximize the City's permissible discretion. And, while it may be in the City's interest in this case to claim that it has an overall duty to enforce the penal law, it might not be in its interest generally to argue that its discretion is constrained. Since the City's apparent concession on this point may not be definitive, we expect on remand that the district court as well as the parties would welcome the views of the New York Solicitor General on this issue.

## II. Conscious Choice

We have held today that a municipality cannot be held liable simply for choosing to enforce the entire Penal Law.[8] In light of that holding, we must know whether the City went beyond a general policy of enforcing the Penal Law to focus on Section 240.30(1). Section 435(a) on its face establishes that the City has a general policy of enforcing state penal law. This is not enough. However, there is some evidence—albeit not conclusive evidence—that the City did make a conscious choice to enforce Section 240.30(1) in an unconstitutional manner. This evidence is in the form of examples of how an individual can violate Section 240.30(1) that are contained in police department training manuals issued to prospective police officers.

---

[8] As we explained in Vives II, Section 240.30(1) is not "'so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.'" 405 F. 3d at 118 (quoting Connecticut ex rel Blumenthal v. Crotty, 346 F.3d 84, 103 (2d Cir. 2003). We therefore leave for another day the question of whether certain statutes that might technically be on the books—for example, anti-miscegenation laws—are so obviously and deeply unconstitutional that the mere fact of their enforcement gives rise to a strong inference that the municipality must have made a "conscious choice" to enforce them.

16

For instance, one manual says:

> John, intending to annoy Ann, sends her anonymous letters in which he calls her "fat" and "ugly." The letters annoy Ann. John has committed Aggravated Harassment 2nd Degree."

Another example reads:

> John, intending to annoy a female, sends her anonymous letters in which he calls her a "whore,"a "prostitute," and a "bitch." The female is annoyed by the letters. John has committed Aggravated Harassment 2nd Degree. John could be properly charged with Aggravated Harassment 2nd Degree because he intended to annoy the female by sending her those anonymous letters.

In giving these examples, the Police Department put flesh on the bones of Section 240.30(1) and apparently instructed officers that they could make arrests for constitutionally protected conduct.

We say "apparently" because there is much that we still do not know about these manuals —including who wrote them, how policymaking officials[9] view them, to what extent they have been used to train or assist officers, and whether any additional documents or directives circulated within the department limit their application in these circumstances. These are all issues to be explored on remand. We underscore that the manuals are simply one indication of departmental policy—and therefore Vives remains free to advance other evidence and arguments establishing that the City made a conscious choice to enforce the statute in an unconstitutional manner.

## III. Causation

---

[9] "[T]he authority to make municipal policy is necessarily the authority to make final policy. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policy makers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." St. Louis v. Prapotnik, 485 U.S. 112, 127 (1988) (plurality opinion) (internal citation omitted).

17

Resolution of the policy issue should also resolve the issue of causation.  Relying principally on Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397 (1997), the City urges that the violation of Vives's constitutional rights was not caused by its intentional act.  Rather, the City contends, the injury to Vives was a result of actions taken by the actors who have immunity in this case—the state, which enacted Section 240.30, and the individual officers.  While we agree that Bryan County sets out the appropriate test for determining whether a municipal action caused a constitutional injury, we disagree with the City's claim that application of the Bryan County test to the facts of this case does not allow a finding that the City's policy caused Vives's injury.  In Bryan County, the alleged municipal action was a sheriff's decision to hire a relative, Stacy Burns, without subjecting him to an adequate background check.  Bryan County, 520 U.S. at 401. Burns, who had been convicted of misdemeanors including assault and battery, later allegedly used excessive force against the plaintiff, Jill Brown.  See id. at 400-01.  There was no allegation that Bryan County had a policy of failing to screen applicants or one of using excessive force.  Rather, Brown sought to hold the county liable based on the sheriff's single act of failing to properly screen Burns's background.  The Bryan County Court carefully distinguished between the situation presented to it and a situation in which a municipality is alleged to have formulated a policy.  In the first instance involving a single action by a policymaker, the Court held that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  520 U.S. at 405.  However, the Court also carefully noted that where  "a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so," the allegation renders "issues of fault and causation straightforward."  Id. at 404 (second emphasis added);  see

18

Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 125 (2d Cir. 2004) ("Monell established that alleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself."). The Bryan County Court also said: "Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." 520 U.S. at 405.

In light of Bryan County and Amnesty America, the answer to the causation inquiry must flow from the district court's unappealed holding that Section 240.30 is unconstitutional, and the determination—yet to be definitively made—of whether a City policymaker made a conscious choice to instruct officers to enforce Section 240.30(1) when the City was not required to do so.

## CONCLUSION

For the reasons we have discussed, we vacate and remand in order that the district court may solicit briefing from the Solicitor General on whether state law imposes an obligation on the City to enforce Section 240.30(1) and clarify the relationship between the manuals and department policy. After the district court issues its new opinion, either party may restore jurisdiction to this court by filing a copy of the district court's new opinion with this court. See United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994). Upon receipt of that decision, the Clerk shall set a schedule for submission of a supplemental joint appendix and briefs.

19