# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1457

_____

Shawn Slaven and Julie Slaven, individually
and as parents and next friends for C.S., A.S.,
and J.S.

*Plaintiffs - Appellants*

v.

Dan Engstrom, Human Services and Public
Health Department for Hennepin County, in
his official capacity as the Director or his successor;
Hennepin County, a governmental entity within the
State of Minnesota; Donothan R. Bartley, in his official
capacity as a social worker for the Hennepin County
Human Services and Public Health Department or his
successor; Jamie L. Cork, in her official capacity as an
Assistant County Attorney for Hennepin County or her successor

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 17, 2012
Filed: March 22, 2013

_____

Before LOKEN, SMITH, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Shawn and Julie Slaven, individually and as parents and next friends for C.S., A.S., and J.S., (collectively, "the Slavens") brought suit against Hennepin County, a governmental entity within the State of Minnesota, and three of its employees[1] in their official capacities (collectively, "Hennepin County") under 42 U.S.C. § 1983 for violations of their procedural due process rights stemming from their child-protection case. Count I of the complaint alleged that Hennepin County violated the Slavens' procedural due process rights by failing to provide adequate notice of an emergency protective custody (EPC) hearing and failing to provide a meaningful hearing. Count II of the complaint alleged that Hennepin County violated the Slavens' procedural due process rights because the 62-day delay between the EPC hearing and the scheduled trial was unconstitutionally long, therefore depriving them of "an opportunity to be heard at a meaningful time or in a meaningful manner." (Quotation marks in original.) The district court[2] granted summary judgment to Hennepin County, concluding that Hennepin County was not liable under § 1983 for implementing or enforcing Minnesota law when Hennepin County was required to do so. *See Slaven v. Engstrom*, 848 F. Supp. 2d 994, 1004 (D. Minn. 2012). We affirm.

I. *Background*

The Slavens reside in Plymouth, Minnesota, and are parents of minor children C.S., A.S., and J.S. On August 18, 2009, Julie Slaven carried two-month-old C.S. in

---

[1]Dan Engstrom, Director of Hennepin County Human Services and Public Health Department; Donothan R. Bartley, a social worker for the Hennepin County Human Services and Public Health Department; and Jamie L. Cork, Hennepin County Assistant Attorney.

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

his car seat up the steps to their home. Unfortunately, C.S. accidentally fell out of the car seat and hit his head on the ground. Julie Slaven called 911, and police and emergency responders came to the home. Although C.S. had no external injuries, he was transported via ambulance to the hospital as a precaution. The police called Shawn Slaven and provided care for the other children until he arrived.

At the hospital, medical staff performed a computed tomography scan ("CT scan") of C.S.'s head. He was kept overnight at the hospital for observation. The following morning, he underwent a second CT scan. The CT scans showed chronic blood in C.S.'s bilateral frontal lobes. Based on the test results, hospital staff filed a report of suspected child abuse with Hennepin County on August 20, 2009, stating that the CT scan findings were inconsistent with a fall from a car seat. On the same date, C.S. had a retinal scan. Also on that date, the hospital asked Dr. Mark Hudson, a Board-Certified Child Abuse Pediatrician, to examine C.S. Dr. Hudson examined C.S. and reviewed his CT and retinal scans. According to Dr. Hudson's report, the test results raised concern. Dr. Hudson opined, "Based on the medical findings there is reason to be quite concerned that the history does not account for the medical findings and C.S.'s ongoing safety must be a consideration. All of that being said there is no single finding here diagnostic of non-accidental injury." *Slaven*, 848 F. Supp. 2d at 998 (quotation, alteration, and citation omitted).

Donothan R. Bartley, a Hennepin County social worker, opened a child-protection investigation based on the report of suspected child abuse. Bartley, along with Detective Molly Lynch of the Plymouth Police Department, interviewed the Slavens. Bartley and Detective Lynch also interviewed Dr. Hudson, who informed them that a retinal hemorrhage, like the one found in C.S., may result from shaking. He also informed them that the Slavens declined consent to perform a bone scan due to fear of excessive radiation. Julie Slaven claims that Detective Lynch used high-pressure tactics on the Slavens, telling them that she would arrange to have all of their

children taken from them and placed in a foster home with a middle-of-the-night raid of their home if they did not consent to a bone scan.

Based on Dr. Hudson's findings and the lack of a bone scan, Detective Lynch placed C.S. on an emergency "72-Hour Police Health and Welfare Hold" on the afternoon of August 20, 2009. The hold prohibited the Slavens from seeing C.S., except for feeding times with supervision.

On August 21, 2009, Bartley and Detective Lynch interviewed the Slavens' other children in the home of their maternal grandparents, Marjorie and Stanley Leuthner ("the Leuthners"). Aside from Bartley and Detective Lynch, no one else was present with the children during the interview. That same day, C.S. had a bone scan after the Slavens consented. In the afternoon, Bartley gave Julie Slaven a handwritten note stating, "Tuesday, August 22, 2009 Juvenile Justice Center . . . Stop by front desk if you want to apply for a PD (public defender)." *Id*. at 999 (alteration in original) (quotation and citation omitted). In actuality, August 22, 2009, was a Saturday, and the EPC hearing was set for Tuesday, August 25, 2009.

Minnesota law provides that a peace officer may take a child into immediate custody "when [the] child is found in surroundings or conditions which endanger the child's health or welfare or which such peace officer reasonably believes will endanger the child's health or welfare." Minn. Stat. Ann. § 260C.175, subd. 1(2)(ii). If a peace officer takes a child into custody, then "the court shall hold a hearing within 72 hours of the time the child was taken into custody, excluding Saturdays, Sundays, and holidays, to determine whether the child should continue in custody." *Id*. § 260C.178, subd. 1(a). Additionally,

> [n]o child taken into custody . . . by a peace officer . . . may be held in custody longer than 72 hours, excluding Saturdays, Sundays and holidays, unless a petition has been filed and the judge . . . determines

-4-

> . . . that the child shall remain in custody or unless the court has made a finding of domestic abuse perpetrated by a minor after a hearing . . . , in which case the court may extend the period of detention for an additional seven days . . . .

*Id.* § 260C.176, subd. 2(b). At the EPC hearing, "[t]he court shall dismiss the petition if it finds that the petition fails to establish a prima facie showing that a juvenile protection matter exists and that the child is the subject of that matter." Minn. R. Juv. Prot. P. 30.08, subd. 1(a). But if the court concludes "that the petition establishes a prima facie showing that a juvenile protection matter exists and that the child is the subject of that matter," then it must further decide

> whether the petition also makes a prima facie showing that:
>
> > (i) the child or others would be immediately endangered by the child's actions if the child were released to the care of the parent or legal custodian; or
> >
> > (ii) the child's health, safety, or welfare would be immediately endangered if the child were released to the care of the parent or legal custodian.

*Id.*, subd. 1(b)(1)(i)–(ii). If the court makes an endangerment determination, then it must "continue protective care or release the child to the child's parent or legal custodian and impose conditions to ensure the safety of the child or others." *Id.*, subd. 1(b)(2).

On August 25, 2009, the Slavens appeared with counsel, Eric Olson, at the EPC hearing. Jamie L. Cork, Hennepin County Assistant Attorney; Bartley; and Sarah Storm, the assigned social worker for the case, appeared on Hennepin County's behalf. A guardian ad litem for the children also appeared. Judge Kathryn L. Quaintance, Minnesota Fourth Judicial District Judge for Hennepin County,

conducted the EPC hearing. At the hearing, the Slavens received a summons and petition. The petition, which Hennepin County filed on August 25, 2009, named not only C.S. but also A.S. and J.S. as subjects of the petition. The petition relayed the Slavens' account of events and Dr. Hudson's statement that "there is not a single finding here diagnostic of non-accidental injury." *Slaven*, 848 F. Supp. 2d at 999 (quotation and citation omitted). But the petition erroneously stated that "Mr. and Mrs. Slaven would not agree to a Skeletal Survey" when, in fact, the Slavens ultimately permitted the bone scan after initially withholding consent. *Id*. at 999–1000 (quotation and citation omitted). Both Cork and Bartley had signed the petition.

At the hearing, Cork "ask[ed] the Court to find that there is a prima facie showing that a child protection matter exists within the four corners of the petition, and that all three children listed are the subjects of that matter." She also requested that the court "find . . . that . . . if the children were in the care and custody of Mr. and Mrs. Slaven, that their health, safety, and welfare would be in immediate danger." Cork also explained that, although the police department placed a 72-hour hold on J.S., "the two oldest children," A.S. and J.S., had been staying with the Leuthners on a voluntary basis. Cork presented the court with "an Emergency Protective Care Findings and Order" to keep "those children . . . out of the care and custody of the Slavens." Judge Quaintance then asked Olson for his views on the children's placement. Olson referenced "an *in camera* discussion about the futility of challenging the veracity of the [p]etition." *Slaven*, 848 F. Supp. 2d at 1000. Specifically, Olson stated:

> I know we discussed this at length in chambers[,] and the Court was very clear that you didn't want us to be trying the facts in front of you here today. But I have got to note that the petition itself brings doubt into what actually occurred here, and they contradict each other . . . .

\* \* \*

> I am sure the Court is going to [make] a prima facie finding in the petition, but there clearly is some question about what happened here . . . .

Thus, Olson "confined [his] argument to asserting the [p]etition itself was intrinsically inconsistent and did not support a prima facie finding of a child in need of protection or services." *Slaven*, 848 F. Supp. 2d at 1000. Olson requested that "the Leuthners move into the Slavens' home, Julie Slaven move out (but Shawn Slaven would remain), and the Leuthners supervise visitation." *Id*. Following the parties' arguments, Judge Quaintance

> f[ound] that . . . the petition sets forth a prima facie case of a child in need of protection and services, and that because of this incident, which doesn't yet have a full explanation, according to the physicians, [C.S.'s] health, safety[,] and welfare, and that of his siblings would be in imminent harm and danger if they were returned to the care of Ms. Slaven.

Judge Quaintance adopted the Slavens' proposed placement arrangement. Thereafter, Judge Quaintance discussed the future "pretrial and trial date." "Judge Quaintance proposed a pre-trial hearing date of September 17, 2009, but due to the Slavens' and their attorney's schedules[,] the date of September 21, 2009[,] was selected." *Slaven*, 848 F. Supp. 2d at 1000. The clerk set a "trial date . . . for Judge Quaintance's 'trial block' that allotted her days for trial beginning on October 26, 2009[,] and ending October 29, 2009." *Id*. A trial date of "October 26, 2009, was sixty-two days after the EPC [h]earing." *Id*. The Slavens did not object to this trial date even though "[t]he Minnesota Rules of Juvenile Protection Procedure require that a trial be held within sixty days of an EPC [h]earing or another hearing (not applicable here) known as an admit/deny hearing." *Id*. (citing Minn. R. Juv. Prot. P. 39.02, subd. 1).

The Slavens claim that, after the EPC hearing, Hennepin County failed to "perform any further investigation of the August 18th accident." *Id*. (quotation and citation omitted). The record reflects otherwise, as Storm actually completed two home visits before the pretrial hearing. Based on the home visits and the Slavens' agreement to abide by their case plan, Hennepin County recommended at the September 21 pretrial hearing that the children be transitioned back into the full care and custody of the Slavens over a period of several weeks. "By Order dated September 28, 2009, Judge Quaintance allowed Julie Slaven to return home, subject to continued supervision by the Leuthners, and allowed her two hours a day of unsupervised time with the children." *Id*. Following the pretrial hearing, the Slavens underwent parenting assessments, which reported "that C.S.'s injury was accidental and recommended that the children be gradually returned to the care of the Slavens." *Id*. at 1001.

"By Order dated October 12, 2009, Judge Quaintance ordered that supervision of the Slavens be gradually phased out with no supervision beginning the week of October 26, 2009." *Id*. On October 26, 2009, Judge Quaintance held another pretrial hearing in which Cork requested a 30-day continuance based upon an anticipated request for dismissal without adjudication. Cork stated that "[b]ased upon the observations, it appears that the children are safe in the Slaven[s'] care, and that the incident that occurred . . . was accidental." Cork asked to keep the trial date of December 21, 2009, in case dismissal did not occur. Olson, on behalf of the Slavens, had no objection to the continuance. "Judge Quaintance ordered the case be continued for thirty days at which time the parties could request dismissal without adjudication." *Slaven*, 848 F. Supp. 2d at 1001. On December 7, 2009, Judge Quaintance dismissed the petition at the parties' request.

The Slavens brought suit against Hennepin County under 42 U.S.C. § 1983 for violations of their procedural due process rights stemming from their child-protection case. The Slavens sought "relief against certain county officials who engaged in

conduct under the unconstitutional authority of *Minnesota* statutes and court rules to deny [them their] due process rights." (Emphasis added.) Count I of the complaint alleged that Hennepin County violated the Slavens' procedural due process rights by failing to provide adequate notice of an EPC hearing and failing to provide a meaningful hearing. Specifically, Count I alleged that

> *Minnesota* procedures regarding emergency protective care of children and other applicable hearing statutes and court rules, as applied in their circumstances, violated their constitutional right to procedural due process under the Fourteenth Amendment of the U.S. Constitution because they never "received an opportunity to be heard at a meaningful time in a meaningful manner," among other procedural legal and factual infirmities.

(Emphasis added.)

The Slavens alleged that Hennepin County "knew that the Slavens had a right to offer rebuttable evidence to overcome or invalidate the offered 'prima facie' petition," but that during the EPC hearing "*the court* denied the Slavens right to provide rebuttal evidence and the right to cross-examine witnesses among other rights afforded to the Slavens." (Emphasis added.) According to the Slavens, Hennepin County "knowingly participated in the Slavens denied right to due process." "As a result, [the Slavens asserted that] the governing statute *Minn. Stat § 260C.163*[3] *and*

---

[3]Section 260C.163, subdivision 2, provides, in relevant part, that

> [a] parent with a legally recognized parent and child relationship must be provided the right to be heard in any review or hearing held with respect to the child, which includes the right to be heard on the disposition order under section 260C.201, subdivision 1, parental visitation under section 260C.178, and the out-of-home placement plan under section 260C.212, subdivision 1.

*Minn. R. Juv. Pro. 30.08* failed to provide a fair and meaningful hearing on August 25, 2009." (Emphasis added.)

Count II of the complaint alleged that Hennepin County violated the Slavens' procedural due process rights because the 62-day delay between the EPC hearing and the scheduled trial was unconstitutionally long, as the delay deprived them of "an opportunity to be heard at a meaningful time or in a meaningful manner." (Quotation marks in original.) Specifically, Count II alleged, in relevant part:

> 45. *Minnesota Statute § 260C.163* is devoid of a required scheduling of a timely and expedient adjudicative hearing after the Minn. R. Civ. P. 30.01 emergency protective hearing. In this respect, the statute is unconstitutional.
>
> 46. *Minnesota Court Rules for Juvenile Protection Procedure 30.11, subd. 3* allows the court to schedule a formal review hearing "at any time." The phrase "at any time" is unconstitutionally vague and arbitrary.
>
> 47. *Because of the restrictions placed upon the Plaintiffs*, the Defendants, acting under the color of state law, interfered with the constitutional protections afforded to parents and their children, and continued to interfere with their constitutional rights for more than 62 days.
>
> 48. In addition, the *statutory absence* of a specific deadline and the similar absence of a formal hearing deadline of *applicable court rules* for a formal hearing, considering the constitutional rights implicated involving the infant and parent, allows for arbitrary scheduling and thus, the lack of due process. The Defendants participated in the scheduling of the arbitrary hearing date and the

Defendants' failure to expedite the adjudication of their petition caused the restricted separation between the Plaintiffs for over 62 days.

49. The length of time between the filing of the August 25, 2009 petition and the scheduled trial *by the court* was so arbitrary that it can be said to shock the conscience.

(Emphases added.)

The parties filed cross-motions for summary judgment. The district court denied the Slavens' motion, granted Hennepin County's motion, and dismissed with prejudice the Slavens' complaint. The district court concluded that Hennepin County was not liable under § 1983 for implementing or enforcing Minnesota law because Hennepin County was required to do so. *Slaven*, 848 F. Supp. 2d at 1004.

## II. *Discussion*

On appeal, the Slavens argue that the district court erred in granting Hennepin County summary judgment on their claims of procedural due process violations. According to the Slavens, "[w]hen a county implement[s] a policy *under state law* that is violative of the constitutional right to due process, it is liable under 42 U.S.C. § 1983 regardless of the constitutional status of the statute or procedures the county claims to have followed." (Emphasis added.) The Slavens assert that they were prohibited from "challeng[ing] the premise of the petition [at the EPC hearing,] although statutorily and procedurally required to do so." As a result, they claim that the EPC hearing was constitutionally infirm. They also cite Hennepin County's admission 62 days after the EPC hearing that C.S.'s fall was accidental. They contend that the County's failure to inform the court prior to the expiration of these 62 days that the fall was accidental "unnecessarily continu[ed] government oversight of a family that did not need nor desire[] the governmental intrusion in their lives."

"The Due Process Clause provides that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law.'" *Lind v. Midland Funding, L.L.C.*, 688 F.3d 402, 405 (8th Cir. 2012) (alterations in original) (quoting U.S. Const. amend. XIV, § 1). Even though "[d]ue process is a flexible concept, requiring only such procedural protections as the particular situation demands," *id*. (quotations and citations omitted), "procedural due process has [a] clear [meaning]: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified," *id*. at 405–06 (quotations and citations omitted). "[T]he opportunity to be heard must come 'at a meaningful time and in a meaningful manner.'" *Id*. at 406 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). A party "need not receive actual notice, but only notice that is reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Id*. (quotation and citation omitted).

Additionally, "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion). "That liberty interest is limited by the compelling governmental interest in protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." *Whisman Through Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997) (quotation and citation omitted); *see also Dornheim v. Sholes*, 430 F.3d 919, 925–26 (8th Cir. 2005) ("However, the right to family integrity clearly does not include a constitutional right to be free from child abuse investigations, as the state has a strong interest in protecting the safety and welfare of minor children, particularly where protection is considered necessary as against the parents themselves." (quotation, alteration, and citation omitted)).

Here, the Slavens alleged that Hennepin County "engaged in conduct under the unconstitutional authority of Minnesota statutes and court rules to deny [them their] due process rights." Hennepin County is a unit of local government that is a "person"

-12-

within the meaning of Section 1983. As the Supreme Court explained in *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, a plaintiff "seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." 520 U.S. 397, 403 (1997). This requirement ensures that a unit of local government "is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id*. at 403–04.

In the present case, the Slavens' complaint is devoid of *any* allegations of an unconstitutional *Hennepin County* policy separate and distinct from Minnesota law. As set forth *supra*, Counts I and II of their complaint repeatedly reference specific Minnesota statutes, rules, and procedures as depriving them of due process. In fact, both Counts I and II of the Slavens' complaint challenge Judge Quaintance's application of Minnesota law and handling and scheduling of the EPC hearing and formal hearing. These counts do not challenge a particular policy that Hennepin County promulgated. For example, ¶ 33 of Count I provides:

> During the August 25, 2009 hearing, *the court* denied the Slavens right to provide rebuttal evidence and the right to cross-examine witnesses among other rights afforded to the Slavens. The Defendants had in their possession evidence of a nature that could overcome, invalidate, or rebut the allegations of the offered petition to the court. They did not or refused to present this evidence to the court. Thus, the Defendants *knowingly participated in* the Slavens denied right to due process.

(Emphases added.) Because the court "denied [the Slavens] the right to present evidence[,] including cross-examination of witnesses during [the EPC] hearing," the Slavens allege that they "were denied the right to be heard."

-13-

Similarly, ¶ 44 of Count II alleges that "*the court . . .* ordered and scheduled a formal trial hearing for October 26, 2009—62 days after the August 25, 2009 hearing." (Emphasis added.) According to the Slavens, because "Minnesota Statute § 260C.163 is devoid of a required scheduling of a timely and expedient adjudicative hearing after the [EPC] hearing," § 260C.163 "is unconstitutional." Likewise, they allege that because "Minnesota Court Rules [of] Juvenile Protection Procedure 30.11, subd. 3 allows *the court* to schedule a formal review hearing 'at any time," it "is unconstitutionally vague and arbitrary." (Emphasis added.) Count II concludes that "[b]ecause of the restrictions placed upon the Plaintiffs" by the court and Minnesota law, Hennepin County "interfered with the constitutional protections afforded to parents and their children, and continued to interfere with their constitutional rights for more than 62 days."

Additionally, ¶ 48 of Count II provides that "the *statutory* absence of a specific deadline and the similar absence of a formal hearing deadline of *applicable court rules* for a formal hearing" resulted in "arbitrary scheduling and thus, the lack of due process." (Emphases added.) The Slavens claim that Hennepin County "participated in the scheduling of the arbitrary hearing date" by the court. As a result, the Slavens conclude that "[t]he length of time between the filing of the August 25, 2009 petition and the scheduled trial *by the court* was so arbitrary that it can be said to shock the conscience." (Emphasis added.)

As the district court explained:

> Under Minnesota law, child protection matters are tried *before the courts of Minnesota*. Minn. Stat. § 260C.101, subd. 1 ("The juvenile court has original and exclusive jurisdiction in proceedings concerning any child who is alleged to be in need of protection or services . . . ."). Inherent in judicial authority is the authority of the court to set its own schedule. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 81 L. Ed. 153 (1936) ("[T]he power to stay proceedings is incidental to the

-14-

power inherent in every court to control the disposition of the causes on its docket with economy of time and effort . . . .").

*Slaven*, 848 F. Supp. 2d at 1004 (emphasis added). Minnesota law provides that court judges and their staffs in the various judicial districts are state employees, not county employees. *See* Minn. Stat. Ann. § 480.181, subd. 1(b)(1)–(3).

And, under Minnesota law, the state court—not Hennepin County—is responsible for service of the summons and petition. *See* Minn. Stat. Ann. § 260B.152, subd. 2 ("Service of summons . . . shall be made by any suitable person under the direction of the court . . . ."); Minn. R. Juv. Prot. P. 32.02, subd. 2(a) ("The court shall serve a summons and petition upon each party . . . ."). The Minnesota Rules of Juvenile Protection Procedure also state that "[i]f the initial hearing is an emergency protective care hearing, written notice is not required to be served. Instead, the *court* administrator, or *designee*, shall use whatever method is available to inform all parties and participants . . . of the date, time, and location of the hearing." Minn. R. Juv. Prot. P. 32.03, subd. 2(a) (emphases added). Bartley acted as the state court's "designee" when he notified the Slavens of the EPC hearing with a note containing the date, time, and location of the hearing. And, the state court staff served the Slavens with the summons and petition at the EPC hearing. *See* Minn. R. Juv. Prot. P. 30.07, 32.02, subd. 5(a).

In summary, Hennepin County lacks any policymaking authority regarding the handling and scheduling of the EPC hearing and formal hearing. The Slavens' complaint essentially alleges that *Minnesota law*, and the state court judge's application of that law—not an independent Hennepin County policy—caused the procedural due process violations. Hennepin County cannot be liable to the Slavens

under § 1983 for the violation of their procedural due process rights based on the allegations contained in this complaint.[4]

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

[4]Whether, and if so when, a municipality may be liable under § 1983 for its enforcement of state law has been the subject of extensive debate in the circuits. *See Vives v. City of New York*, 523 F.3d 346, 351–53 (2d Cir. 2008) (collecting and analyzing cases). We need not decide whether a municipality may ever be liable for enforcing state law because, here, there is no evidence or even allegation that Hennepin Court was enforcing state law, as opposed to merely being present in a proceeding where a state court, applying state law, allegedly violated the Slavens' constitutional rights.