RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0080p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KEITH CRABBS,

        *Plaintiff-Appellee,*

    *v.*

ZACH SCOTT,

        *Defendant-Appellant.*

No. 14-4068

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-01126—Michael H. Watson, District Judge.

Argued: April 30, 2015

Decided and Filed: May 4, 2015

Before: NORRIS, SUTTON, and DONALD, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Jesse W. Armstrong, FRANKLIN COUNTY PROSECUTOR'S OFFICE, Columbus, Ohio, for Appellant. Charles W. Hess, HESS LAW OFFICE, Dublin, Ohio, for Appellee. **ON BRIEF:** Jesse W. Armstrong, Amy L. Hiers, FRANKLIN COUNTY PROSECUTOR'S OFFICE, Columbus, Ohio, for Appellant. Michael Garth Moore, Columbus, Ohio, for Appellee.

---

**OPINION**

---

SUTTON, Circuit Judge. Keith Crabbs sued the Franklin County Sheriff under the Fourth (and Fourteenth) Amendment for requiring him to submit to a DNA cheek swab after a jury acquitted him of voluntary manslaughter. The sheriff responded that Ohio's sovereign

immunity insulated him from the lawsuit because state law required him to take the sample. That is not quite true. In 2010, Ohio law required criminal defendants to submit a DNA sample after a felony conviction. *See* Ohio Rev. Code Ann. § 2901.07(B) (West 2010). Today, Ohio law requires county sheriffs to collect DNA after a felony arrest. Ohio Rev. Code § 2901.07(B)(1)(a). The new law applies "during the intake process" to anyone arrested "on or after July 1, 2011." *Id.* In this case, the relevant events straddle the July 1 start date and prompt two questions: Does the statute require a DNA sample for a felony defendant arrested before July 1, 2011, and rearrested after that date for violating bond? And does the statute require a sample after an acquittal if the sheriff was unable to collect one during the intake process? No is the answer to both questions, and for these reasons and others elaborated below the State's sovereign immunity does not bar this civil rights action. We affirm.

In December 2010, Keith Crabbs turned himself in to the Franklin County Sheriff on charges of voluntary manslaughter, a first-degree felony. *Id.* § 2903.03(C). After one night in the county jail, Crabbs was released on bond. His trial began in March 2012. Two days in, the court revoked Crabbs' bond for arriving late and for quarrelling with a witness outside the courthouse. Courtroom deputies arrested Crabbs and took him to jail for processing. According to Sheriff Zach Scott, the amended DNA-collection statute required Crabbs to submit a sample because he "was arrested for a felony." R. 67-1 at 16. For reasons that the record does not reveal, the identification technician did not obtain a sample during the intake process.

That failure triggered an ID hold on Crabbs. As described by Chief Deputy Sheriff Mark Barrett, an ID hold bars an arrestee's release "until the needed identification procedures . . . have been performed and completed." *Id.* at 2. Although an April 2006 internal memo from Barrett maintains that "ID holds alone cannot be used to keep an inmate in jail," R. 89-1 at 3, the sheriff's written procedures provide that "[p]risoners who have an ID hold on them" must finish ID processing "prior to release." R. 67-4 at 43. As a result, even after the jury acquitted Crabbs, officers refused to release him until he submitted to a cheek swab.

Crabbs did not appreciate this requirement. He filed a § 1983 action against Sheriff Scott in his official capacity for making him submit to the cheek swab. Crabbs alleges that the sheriff's DNA-collection and ID-hold policies, when applied to acquitted defendants, violate the

Fourth Amendment. In response, the sheriff claims that sovereign immunity bars the claim. The district court denied Scott's motion for summary judgment, holding that the sheriff enforces these policies not as an arm of the State but as an agent of Franklin County. Scott filed this interlocutory appeal as permitted under the collateral order doctrine. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993).

The States' sovereign immunity, like the federal government's sovereign immunity, is "firmly enshrin[ed] . . . in our constitutional framework" and shields the States from private lawsuits absent their consent or permissible abrogation by Congress. *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 752–53 (2002). This immunity not only protects state treasuries but also "accord[s] States the dignity that is consistent with their status as sovereign entities." *Id.* at 760. Damages actions against state officers in their official capacities count as lawsuits against the State. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). The same is not true for counties and their officers, neither of which share the States' sovereign immunity. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

At first blush, then, this case looks easy. Sheriff Scott is an officer of the county, not the State, and accordingly he may not invoke the *State's* sovereign immunity. But law-enforcement officers sometimes wear multiple hats, acting on behalf of the county *and* the State. In that setting—today's setting—the immunity question is not whether the officer acts for the State or county "in some categorical, 'all or nothing' manner." *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997). Immunity hinges on whether the officer represents the State in the "particular area" or on the "particular issue" in question. *Id.* at 785 & n.2 (citing *Graham*, 473 U.S. at 165). And that depends on how state and local law treat the officer in that setting. *Id.* at 786. Relevant factors include: (1) the State's potential liability for a judgment; (2) how state statutes and courts refer to the officer; (3) who appoints the officer; (4) who pays the officer; (5) the degree of state control over the officer; and (6) whether the functions involved fall within the traditional purview of state or local government. *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (en banc); *see Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44–45 (1994).

Measured by these six factors, Sheriff Scott acted as a county, not a state, official in this instance.

One: The county, not the State, would satisfy any judgment against the sheriff in this case, as the parties agree.

Two: Ohio law classifies county sheriffs as "county officials" and "employees." Ohio Rev. Code §§ 301.28(A)(3), 2744.01; *see Thurlow v. Bd. of Comm'rs of Guernsey Cnty.*, 91 N.E. 193, 194 (Ohio 1910).

Three: The voters of each county elect their own sheriff. Ohio Rev. Code § 311.01(A).

Four: Each county, not the State, pays the salary of its sheriffs and funds their offices. *Id.* §§ 325.01, 311.06.

Five: Each county board has "final authority" over the sheriff's budget, *State ex rel. Trussell v. Meigs Cnty. Bd. of Comm'rs*, 800 N.E.2d 381, 386 (Ohio Ct. App. 2003), and the sheriff serves as the county's "chief law enforcement officer" with jurisdiction "coextensive with" the county's borders, *In re Sulzmann*, 183 N.E. 531, 532 (Ohio 1932).

Six: A sheriff's law enforcement duties at common law represented local functions. *See* 70 Am. Jur. 2d Sheriffs, Police, & Constables § 2. To be sure, the governor can initiate removal proceedings against the sheriff and issue some orders to him, Ohio Rev. Code §§ 3.08, 107.04, but that does not outweigh the rest of Ohio law and its treatment of sheriffs as local officials. Nothing in the Ohio Constitution says anything to the contrary. *Cf. McMillian*, 520 U.S. at 787–89.

All of this explains why Ohio county sheriffs generally are treated as county policymakers. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 484–85 & n.13 (1986). And all of this explains why official-capacity lawsuits against the Franklin County Sheriff challenging his law-enforcement and jail-maintenance policies normally proceed as suits against the county itself. *See, e.g.*, *Petty v. Cnty. of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007); *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005); *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 752 (6th Cir. 2004).

Sheriff Scott tries to fend off this general rule and the application of these considerations by arguing that, for purposes of DNA collection, he serves as an officer of the State. Why?

Because state law—in this case, § 2901.07—controls his DNA-collection policies. "Where county officials are sued simply for complying with state mandates that afford no discretion," he adds, "they act as an arm of the State" under the Eleventh Amendment. *Brotherton v. Cleveland*, 173 F.3d 552, 566 (6th Cir. 1999); *see also, e.g.*, *Vives v. City of N.Y.*, 524 F.3d 346, 353 (2d Cir. 2008) (asking "whether the City had a meaningful choice" of action under state law); *Richman v. Sheahan*, 270 F.3d 430, 440 (7th Cir. 2001) (treating sheriff as county officer because there was "no state policy directing the sheriff's actions").

The sheriff is right in one respect but not in another. He is right that sovereign immunity would bar this lawsuit if state law *required* him to take the actions he took. *See Gottfried v. Med. Planning Servs., Inc.*, 280 F.3d 684, 692–93 (6th Cir. 2002); *Brotherton*, 173 F.3d at 565. But he is wrong to claim that state law required him to swab Crabbs' cheek after his acquittal. "[T]he essential question is the degree of discretion possessed by the official . . . implementing the contested policy." *Cady v. Arenac Cnty.*, 574 F.3d 334, 343 (6th Cir. 2009). If Sheriff Scott's policies "mechanically adopt and enforce" Ohio's DNA-collection law, he may invoke the State's sovereign immunity to deflect Crabbs' suit. *Brotherton*, 173 F.3d at 565. If not, the State's sovereign immunity offers him no refuge.

Scott's application of his DNA-collection policy to Crabbs does not flow inevitably from § 2901.07. For even if Ohio law *permitted* collecting Crabbs' DNA, a point we need not decide, § 2901.07 did not *require* it in his case for two independent reasons.

For one reason, Crabbs' March 2012 arrest for violating the conditions of his bond—the only one occurring after mandatory collection of DNA from arrestees began in July 2011—was not an arrest "for a felony offense." Ohio Rev. Code § 2901.07(B)(1)(a). So far as the record shows, violating bond is not a standalone crime. Nor does violating bond make the resulting arrest one "for" the underlying charge simply because the bond could not have been initially imposed without that charge. That would defy how we normally talk about arrest. We would not say that a prisoner recaptured after escape was "arrested for" the offense that first landed him in jail. Because the new facts leading to the prisoner's second arrest have nothing to do with his original crime, he was not arrested "because of" or "on account of" that crime.

That is not to say authorities may not arrest a suspect twice for the same crime. (A suspect might be arrested, released for lack of evidence, then rearrested for the same offense after new evidence emerges.) Nor is it to say that an arrest for violating bond may not *also* count as an arrest for a felony if felonious conduct *is* the violation. (Complying with the criminal law is an inherent condition of pretrial release. *In re Mason*, 688 N.E.2d 552, 553 (Ohio Ct. App. 1996).) But neither situation reflects Crabbs' case. Crabbs lost his bond for being tardy and for confronting a witness. His felony voluntary-manslaughter charge was irrelevant to his second arrest. Section 2901.07 thus does not apply in his case. That alone defeats Sheriff Scott's claim that he collected Crabbs' DNA as a ministerial arm of the State.

For another reason, no State law required Sheriff Scott to hold Crabbs for a cheek swab after the jury acquitted him. The statute mandates DNA collection "during the *intake* process." Ohio Rev. Code § 2901.07(B)(1)(a) (emphasis added). That did not happen here. The swab occurred during the *release* process, which the statute says nothing about. At most, the law as it stood in 2012 left ID holds within the sheriff's discretion. Subsequent amendments added procedures to deal with what sheriffs should do if they are unable to collect a DNA sample during intake—for example, a court order at arraignment or sentencing to submit to DNA collection within 24 hours—and yet none dealt with this situation, further suggesting that the law never imposed any such requirement on the sheriff. *Compare id.* § 2901.07(B)(1)(b)–(d), *with* Ohio Rev. Code Ann. § 2901.07(B)(1) (West 2012). In no way, then, did Sheriff Scott's DNA-collection and ID-hold policies "mechanically adopt and enforce" Ohio law. *Brotherton*, 173 F.3d at 565. Because Scott "could have opted to act differently, . . . he did not act as an arm of Ohio when he formulated and implemented the contested polic[ies]." *Id.* at 566. That does not make those policies unconstitutional or otherwise illegal, to be clear. But it does leave the sheriff in his normal capacity as a county officer.

Scott persists that he collected Crabbs' DNA in accordance with his statutory duties, not the county's internal policies. That makes no difference. All that would show is that the challenged policies might not be "responsible" for the deprivation of Crabbs' constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (requiring a "causal link between a municipal policy or custom and the

alleged constitutional deprivation"). But that goes to the merits, not sovereign immunity. It does not make the sheriff an arm of the State. Section 2901.07 still left Scott discretion as to the means of collecting Crabbs' DNA. Scott therefore did not "rotely enforce" Ohio law. *Brotherton*, 173 F.3d at 565.

For these reasons, we affirm.